Filed 12/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G055874 |
| v. | (Super. Ct. No. 15NF1695) |
| DONALD LEVAN CLARK, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Cathryn L. Rosciam, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis and Steven T. Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Donald Levan Clark of human trafficking of a minor (Pen. Code, § 236.1, subd. (c)(1) (section 236.1(c)); count 1),[1] attempted pimping of a minor (§§ 664, subd. (a), 266h, subd. (b)(1); count 2), and pandering (§ 266i, subd. (a); count 3). The court sentenced defendant to a total state prison term of 16 years as follows: (1) the middle term of eight years on count 1, which was doubled to 16 years pursuant to the "Three Strikes" law; (2) the middle term of two years on count 2, which was doubled to four years pursuant to the Three Strikes law; and (3) the middle term of four years on count 3, which was doubled to eight years pursuant to the Three Strikes law. Sentences on counts 2 and 3 were stayed pursuant to section 654. The court also struck defendant's prison prior, ordered defendant to register as a sex offender, and required defendant to pay a $300 sex offender fine, $120 in court operations fees, and a $90 criminal conviction assessment.

Defendant raises six primary issues on appeal. First, he contends there was insufficient evidence to sustain his conviction for human trafficking of a minor because the victim was not a real person or minor. Second, he claims there was insufficient evidence to sustain his conviction for attempted pimping. Third, he argues the court improperly admitted prejudicial evidence that he was pimping and pandering other women. Fourth, he contends the People's expert witness improperly opined defendant was guilty of the charged crimes and usurped the jury's fact-finding function. Fifth, he claims his confrontation and due process rights were violated because he could not effectively cross-examine the People's expert witness. Finally, he argues the court erred by failing to instruct the jury on an essential element of human trafficking of a minor.

We disagree with all of defendant's contentions on appeal and affirm the judgment in full. In doing so, we part company with our colleagues in *People v. Shields* (2018) 23 Cal.App.5th 1242 (*Shields*) and the majority in *People v. Moses* (2019) 38

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

Cal.App.5th 757, review granted November 26, 2019, S258143 (*Moses*). Section 236.1(c) has two distinct prongs. The statute is violated when a person either (1) causes, induces, or persuades a person who is a minor to engage in a commercial sex act (the Completed Act Prong) or (2) attempts to cause, induce, or persuade a person who is a minor to engage in a commercial sex act (the Attempted Act Prong.) *Shields* and the majority in *Moses* held that a violation of the Attempted Act Prong of section 236.1(c) requires the target to be an actual minor, not a fictional minor impersonated by a police officer. We respectfully disagree with the court's reasoning in both cases and hold that a person violates the Attempted Act Prong of section 236.1(c) by engaging in the prohibited conduct whether the target is an actual minor or not.

FACTS

*The Incident*

Happy Medina, an Anaheim police officer, worked as an investigator for the Orange County human trafficking task force and investigated crimes related to human trafficking. As part of his duties, he maintained a Facebook page posing as a fictional 17-year-old female named Jessica Bryant. Jessica's Facebook page suggested she was a prostitute and included posts related to pimping and prostitution.

On May 25, 2015, defendant sent a message to Jessica using a Facebook account. After Jessica responded, defendant replied, "My name is P Famous Da Great." He asked her, "How's your situation?" She responded, "Hoes don't get holiday pay." He then asked her how old she was, and she said 17 years old. Defendant asked when she would turn 18, and she responded, "Not soon enough." He told her he would be 25 years old in the following month.

On May 27, 2015, defendant sent another Facebook message to Jessica. He said, "I'm waiting on you." Jessica responded she had "ten toes on the ground," which was a reference to prostitution. She also asked what defendant wanted from her, and he

3

responded, "Your loyalty, dedication and your trust." Defendant promised to give her the same. Jessica then asked about defendant's "price tag," and he said it was $2,500. At trial, Medina explained this referred to a "choose up fee," which is a fee a prostitute pays to a new pimp to work with him. When Jessica told defendant his fee was too high, he responded he was "hoeless" but "2500 was [his] fee in 2011 when [he] was seven deep, so [he was] not [going to] change it now." She asked defendant how much he expected her to make a night, and he answered, "500 plus." Defendant gave his phone number to her and told her to call him. Medina searched the phone number online and found an advertisement with defendant's phone number on a Web site advertising prostitution services.

On May 29, 2015, defendant contacted Jessica again and said "S.M.M.F.P.F.H." Medina interpreted this to mean "shake my mother fucking P Famous head." Jessica told defendant she was considering working with a different pimp who would take 10 percent of the choose up fee, which was $250. Defendant said he was willing to do the same.

On May 31, 2015, Jessica asked defendant, "W Yo' plans for me? Track shit or da back page?" Defendant responded both but that he prefers the track, which is an area where prostitutes solicit business. Defendant told Jessica to "choose up," "come to [Los Angeles]," and "stay down for his crown" (i.e., give him her loyalty). Defendant called her a "hoe" and said it would just be the two of them until he had the opportunity to "knock another bitch." Jessica asked defendant for a photograph, and he sent a photograph showing him lying on a bed with money on his chest and stomach. He also sent a photograph of him smiling and asked Jessica for a photograph. Medina sent a manipulated photograph of a female and repeated she was 17 years old. Defendant answered, "C.T.F.U. [crack the fuck up] Yeah. Okay, lil' hoe."

Over the next few days, Jessica told defendant she had a fight with her mother and had an aunt who was on her death bed. She said she was going to go to San

4

Diego. Defendant said, "Come to me." On June 10, 2015, defendant contacted Jessica and asked where she was. She said she was back home from San Diego, and defendant responded he was still waiting on her and encouraged her to go to Los Angeles. Jessica asked if defendant would help her buy a car because she was only 17 years old. He agreed and said, "Just come down."

Jessica later sent a message to defendant and tried to negotiate a better choose up fee. Defendant said he wanted $500. After Jessica responded this was not what they had originally discussed, defendant called her a "hoe" and "fake ass bitch." Jessica then told him to "have a nice life" and suggested she had intended to send a $250 choose up fee to defendant. He told her to bring the money to him before he "find[s] [her] and beat[s her] ass." He also said he had "knocked two hoes the night prior" and had "another one planning to come from Oregon soon." Defendant then said she could bring the choose up fee to him in person or send it through PayPal. He explained she could get a PayPal account at a 7-Eleven store and gave specific instructions about how she could get a PayPal card.

On June 13, 2015, defendant contacted Jessica again. At one point, defendant said he did not "have any other hoes at that time and . . . wanted [her]." He told Jessica she could send the choose up fee by getting a card at a CVS or Walmart store and sent a photograph of a PayPal card. They eventually agreed Jessica would go to a Walmart store and arrange a wire transfer. During this conversation, Jessica mentioned she had a 16-year-old friend named Kimmie. Defendant responded, "Tell Kimmie to choose up as well." He said he expected both of them to be with him by his birthday and told Jessica to send a $400 choose up fee for both of them.

On June 17, 2015, defendant and Jessica exchanged messages again. Medina then had a female officer call defendant and pretend to be Jessica. They talked about how long it would take Jessica to pay off the choose up fee and how much she could charge for certain sex acts. When Jessica asked how much she could make for a

5

"blow job," defendant said she could make at least $60. She also asked if he would provide the condoms, and defendant agreed. Jessica eventually said she and Kimmie were at a Walmart store where they were arranging to send the choose up fee to defendant. She said she would go to Los Angeles to meet defendant the next day, and defendant gave her instructions on how to take a bus to Union Station where he would pick her up. Jessica reminded defendant she was 17 years old and Kimmie was 16 years old. Defendant said he "[did not] care about none of that." After the call, Medina wired the money to defendant and asked if defendant received the money. Although defendant suggested he received the money, he was arrested the next day before he actually picked up the money.

*The Court's Evidentiary Rulings*

At trial, the court admitted three categories of evidence at issue in this appeal. First, the court admitted defendant's text messages with third parties. Medina testified about each of these conversations. In one conversation, defendant encouraged a woman in Oregon to come to Los Angeles and work for him. He told her his choose up fee was $2,500 and said she could make $1,000 a night in Las Vegas. He also told her he had been pimping for five years and had worked in more than seven states.

In another conversation, defendant communicated with a woman named "Lele," a prostitute who formerly worked for defendant. Defendant told Lele to "[g]et a fee and come home." Defendant also told her he had three other women and "the Snow Bunny" coming over on his birthday. Medina explained a "snow bunny" is a white prostitute and believed this was a reference to Jessica. When Lele indicated she was not interested in working for defendant, he threatened her and said he had other girls working for him.

Defendant exchanged messages with another woman named Destiny, a prostitute who formerly worked for defendant. Destiny complained about how defendant

6

treated her while he was her pimp. Defendant told her he was a pimp and tried to convince her to work for him again.

Defendant also had conversations with several unidentified women. In one conversation with a woman he met on Facebook, defendant told her he was a pimp and encouraged her to be his prostitute. In another conversation, defendant told a woman to come to the track and work for him. He also communicated with a woman named "Passion." He told her to stop using that name and asked her to choose a "Young Compton P." In another conversation, he told a woman, "If you make 200 tonight, we gonna get you some heels tomorrow." Defendant also told her to be mindful of the time she was taking with each sex purchaser because "any extra time is more money."

Finally, defendant exchanged messages with another pimp. They talked about certain prostitution areas and referred to each other as "P."

In admitting the text messages, the court required the People to redact certain information, including references to defendant being on parole and a "concession" regarding defendant's "past." The court found the text messages were probative of defendant's intent in communicating with Jessica who was a fictional minor. The court explained: "[T]he jury has got to decide whether there is an innocent explanation for this or whether . . . these communications on Facebook [with Jessica] indicate an attempt to induce somebody to engage in commercial sex." The court further stated: "[Y]ou've got to be able to look at [defendant's conversations with Jessica] in context to understand what the intent is behind them. And I think the only way to do that is to know the whole context . . . . These text messages are tremendously probative on that point . . . ." According to the court, defendant used "language [in the text messages] and discuss[ed] things which would show that he's really immersed in . . . the culture of prostitution. There are even instances where he basically just says I'm a pimp, and I think that those give context to what he might be talking about in these . . . Facebook discussions with somebody who he allegedly believed was underage."

7

In weighing the probative value and prejudicial effect of the text messages, the court noted there was a risk the text messages "might convince the jury to find [defendant] guilty" based on his past conduct. The court acknowledged it was a "close question" but ultimately found the prejudicial impact and probative value were in "equal poise."

Second, the court admitted defendant's posts on his Facebook and Instagram accounts, which included photographs and memes[2] related to pimping and pandering. The court found the evidence was "highly relevant" to show "what [defendant's] intent was when he was speaking with the fictitious Jessica . . . encouraging her to work for him." The court also found the probative value outweighed the prejudicial impact and required the parties to agree upon redactions.

Third, the court admitted certain photographs and videos retrieved from defendant's cell phone. The court excluded all photographs that were duplicates of defendant's posts on Facebook and Instagram. The court also excluded all photographs depicting defendant with large amounts of money. The court admitted a photograph of defendant holding around $200 while lying on a bed. Because defendant had sent this photograph to Jessica, the court found it was relevant. The court also admitted two additional photographs: (1) a photograph that said "Fly Guy P Famous the Great and Stay Down, Bitch"; and (2) a photograph of defendant with several memes, including one meme that said "Faggotville Population: You."[3] The court found these photographs show defendant was "involved in the lifestyle of pimping" and contained many of the terms Medina had defined for the jury.

_____

[2] Medina explained that a meme is a picture with a word or description on it.

[3] Based on our review of the record, it appears the court admitted additional photographs retrieved from defendant's cell phone. Plaintiff generally identifies these as "photo[graphs] . . . mostly of pimping and prostitution-related memes, and photo[graphs] of [defendant] displaying cash."

With respect to the videos, the court excluded two videos but admitted one video that showed defendant counting $60 while talking about "big racks," a reference to making money through prostitution. Although the video was prejudicial, the court found it was "powerfully probative" because it gave "meaning to the conversations that [defendant had] with [Jessica]." Because the video did not show defendant committing a crime and involved a small amount of money, the court held the prejudicial impact did not substantially outweigh the probative value.

The court also excluded another video depicting defendant with a large sum of money in his hands but allowed the People to play the audio. The court redacted portions of the audio and admitted the remainder because "the discussion of pimping and the culture of pimping is more relevant than it is prejudicial." According to the court, the audio "allows the People when combined with all other evidence including the text messages and the photographs to present their case the defendant is deeply involved in the lifestyle of pimping without creating the potential for the jury to find the defendant guilty because of other pimping . . . ."

## DISCUSSION

*Defendant's Conviction for Human Trafficking of a Minor*

Relying principally on *Shields*, *supra*, 23 Cal.App.5th 1242, defendant argues the evidence is insufficient to sustain his conviction for human trafficking of a minor because Jessica was not a minor — she was a fictitious person. He contends the People had to prove Jessica was an actual minor under 18 years of age because they charged him with the completed offense of human trafficking of a minor. The People disagree, claiming the plain language of section 236.1(c) does not require an actual minor. They argue the statute "incorporate[s] attempts into the definition of the criminal offense and thus provide[s] punishment for those attempts." Because the commission of

9

an attempt does not require proof of any specific element of the completed crime, the People contend the attempt prong of section 236.1(c) can be violated when there is no actual minor. The People also argue a finding that no actual minor is required comports with the electorate's intent in enacting Proposition 35, the Californians Against Sexual Exploitation Act (CASE Act).

The People have the better argument. We hold that the electorate, in adopting the CASE Act, defined the single crime of human trafficking of a minor in two separate ways — an attempted act and a completed act — each of which it chose to punish identically.[4] The phrase "attempt to commit a crime" is a well-established term of art in the criminal law. It is also well-established that the defense of factual impossibility is foreclosed when the proscribed unlawful act is charged as an attempt. Thus, where the act is attempted, but not completed, defendant may not rely on factual impossibility as a defense. Accordingly, the existence of an actual minor is not required where defendant is charged with an attempt under the statute.

We start with the words of the statute. Section 236.1(c) provides: "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [s]ection 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human

---

[4]     We do not rely on the supposed intent of the electorate as being helpful in our interpretation of the statute. We rely only on the actual words chosen by the electorate and relevant law in our interpretation of those words. Although the People cite ballot materials showing the electorate passed Proposition 35 with the intent to make the crime of human trafficking of a minor easier to prove, to allow law enforcement to track and prevent online sex offenses and human trafficking, and to provide greater punishment, those purposes are not helpful in determining how section 236.1(c) is to be interpreted or applied.

10

trafficking."[5]  Plainly, the statute has two distinct prongs.  The statute is violated when a person either (1) causes, induces, or persuades a person who is a minor to engage in a commercial sex act (the Completed Act Prong) or (2) attempts to cause, induce, or persuade a person who is a minor to engage in a commercial sex act (the Attempted Act Prong).  The punishment for violation of either prong is identical, and includes a state prison term of 5, 8, or 12 years (§ 236.1(c)(1)), or 15 years to life if the offense involves force, fear, fraud, deceit, violence, duress, menace, or threat of unlawful injury to the victim or to another person (§ 236.1(c)(2)).  Here, the People pursued defendant's conviction under the Attempted Act Prong of the statute — the prong that has generated confusion and the interpretation of which results in our departure from the reasoning of our colleagues in *Shields*, *supra*, 23 Cal.App.5th 1242 and the majority opinion in *Moses*, *supra*, 38 Cal.App.5th 757, review granted.

The factual backgrounds in both *Shields* and *Moses* are, for purposes of analyzing the issue before us, essentially identical.  In *Shields*, the defendant became friends with a fictional 17-year-old prostitute through her Facebook page, which was created by an undercover officer.  (*Shields*, *supra*, 23 Cal.App.5th at p. 1244.)  Defendant's relationship and conversations with the fictional minor ultimately led to his arrest.  (*Id.* at p. 1247.)  In reversing his conviction, the court held the third element of the offense — the victim must be under 18 years of age — could not be satisfied because the victim was not an actual minor.  (*Shields*, at p. 1256.)  In *Moses*, the defendant also communicated with a fictional 17-year-old prostitute through an Internet site.  (*Moses*, *supra*, 38 Cal.App.5th at pp. 759-760, review granted.)  Those conversations with the fictional minor also ultimately led to his arrest.  (*Id*. at p. 760.)  As in *Shields*, the majority of another panel of this court likewise reversed the conviction because the

---

[5]  The enumerated statutes define various sex crimes including procuring a minor for prostitution, pimping, pandering, abduction of a minor for prostitution, sale and distribution of obscene matter, obscene live conduct, and extortion.

11

victim was not an actual minor.  (*Moses*, at p. 759.)  We disagree with the analysis in *Shields* and the majority opinion in *Moses*.

We begin with a seemingly simple definition.  Section 21a defines the phrase "attempt to commit a crime" thusly:  "An attempt to commit a crime consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  The Penal Code guides our interpretation of its provisions.  Section 7, subdivision (16) provides that "[w]ords and phrases must be construed according to the context and the approved usage of the language; but technical words and phrases, and *such others as may have acquired a peculiar and appropriate meaning in law, must be construed according to such peculiar and appropriate meaning.*"  (Italics added.)  The phrase "attempt to commit a crime" (§ 21a) as used in the criminal law, is one of those words that has "acquired a peculiar and appropriate meaning in law," and accordingly "must be construed according to such peculiar and appropriate meaning."  (§ 7, subd. 16; cf. *In re Estate of Kirby* (1912) 162 Cal. 91, 93 [word "murder" is a technical word that "has acquired a peculiar and appropriate meaning in the law"].)  "[W]hen a word used in a statute has a well-established *legal* meaning, it will be given that meaning in construing the statute.  This has long been the law of California: 'The rule of construction of statutes is plain.  Where they make use of words and phrases of a well-known and definite sense in the law, they are to be received and expounded in the same sense in the statute.'"  (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 19.)  As used *throughout* the Penal Code, therefore, an "attempt to commit a crime" embodies both "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission."  (§ 21a.)

Despite the ubiquitous use of the attempt to commit a crime language in the Penal Code as having the meaning ascribed to it in section 21a, the court in *Shields*, and the majority opinion in *Moses*, held the phrase had a different meaning in section 236.1(c).  Those courts held that the attempt to commit the crime of causing, inducing, or

12

persuading a person who is a minor at the time of commission of the offense to engage in a commercial sex act meant something *more* than required by section 21a — the existence of an actual minor. In effect, those courts rewrote the Attempted Act Prong of section 236.1(c) to require proof of an element of the completed crime, in derogation of section 21a which does not require such proof. (*Shields*, *supra*, 23 Cal.App.5th at p. 1250 [referring to the "false premise that section 236.1(c) criminalizes an attempt to commit a crime"]; *Moses*, *supra*, 38 Cal.App.5th at p. 761 ["We find the *Shields* analysis persuasive concerning the distinction between a traditional 'attempt' crime and the discrete crime described in section 236.1(c)"], review granted.)

Defendant has not identified any section of the Penal Code that uses the word "attempt" or the phrase "attempt to commit a crime" to mean something other than the definition in section 21a. And we are aware of only one such instance. Section 240 defines the crime of assault this way: "An assault is an unlawful *attempt*, coupled with a present ability, to commit a violent injury on the person of another." (Italics added.) In considering this statutory definition of assault, our Supreme Court noted that despite the definition's use of the word "attempt," the crime of assault is recognized to be a general intent crime, thus making the definition of "assault" seemingly inconsistent with the statutory definition of "attempt" which requires a specific intent. (*People v. Colantuono* (1994) 7 Cal.4th 206, 216, abrogated by statute on another ground as stated in *People v. Conley* (2016) 63 Cal.4th 646, 660, fn. 4, italics added.) The Court explained that "the Legislature of 1872 used the reference [to attempt] only in its ordinary sense, not as *the term of art* we currently conceptualize, i.e., a failed or ineffectual effort to commit a substantive offense." (*Ibid.*) Here, we do not have a historical anomaly "developed at an earlier day than the doctrine of criminal attempt in general . . . ." (*Colantuono* at p. 216.) We have instead language chosen by the electorate in 2012, some 26 years after the enactment of the statutory definition of "attempt" (Stats. 1986, ch. 519 § 1), and the even earlier adoption of similar language at common law. (See, e.g., *People v. Anderson*

13

(1934) 1 Cal.2d 687, 689 ["An attempt to commit a crime consists of two elements, viz., the intent to commit it, and a direct, ineffectual act done toward its commission"].)

Accordingly, applying the well understood definition of "attempt to commit a crime," as we *must*, (§ 7, subd. (16)) to the Attempted Act Prong of section 236.1(c), we see that the Attempted Act Prong of the statute is violated when a person specifically intends to take a direct act to cause, induce, or persuade a minor to commit a commercial sex act intending to effect or maintain a violation of one of the enumerated sex offenses, and actually takes the intended direct act. That the minor does not exist means only that the attempt failed — a violation of the Attempted Act Prong of section 236.1(c) is complete when the intended act is taken, even though it fails.

Our recognition that the Attempted Act Prong of section 236.1(c) constitutes but one of two separate means by which the statute may be violated brings with it the additional recognition that factual impossibility is not a defense to the Attempted Act Prong of the statute. "[F]actual impossibility is not a defense to a charge of attempt." (*People v. Peppars* (1983) 140 Cal.App.3d 677, 688.) And this concept has been employed routinely by law enforcement officers in the course of enforcing sex crimes against minors. (See *People v. Korwin* (2019) 36 Cal.App.5th 682, 688 [defendant guilty of attempting to communicate with fictitious minor portrayed by police officer in violation of § 288.3, subd. (a)]; *People v. Reed* (1996) 53 Cal.App.4th 389, 396 (*Reed*) [defendant found guilty of attempted lewd conduct as to a fictitious child victim portrayed by a police officer].) Under these principles, guilt under the Attempted Act Prong of section 236.1(c) is not dependent upon the existence of an actual minor.

As we have noted, *Shields* and the majority opinion in *Moses* concluded that a violation of the Attempted Act Prong of section 236.1(c) requires the existence of an actual minor victim — a police officer could not be used as a decoy to establish the offense. The majority opinion in *Moses* relied heavily on the analysis in *Shields*. But the dissenting opinion in *Moses* disagreed with the *Shields* analysis and concluded that it was

14

"inconsistent with how our Supreme Court and appellate courts have interpreted similar criminal statutes penalizing attempts." (*Moses*, *supra*, 38 Cal.App.5th at p. 768, (dis. opn. of Aronson, J.), review granted.) The dissenting opinion in *Moses* further concluded that the *Shields* analysis "requiring an actual minor victim, contradicts the stated findings and purposes of the CASE Act." (*Id.* at p. 774 (dis.opn. of Aronson, J.) We agree with Justice Aronson's well-reasoned dissent in *Moses*.

The fundamental point of our disagreement with *Shields*, and the majority opinion in *Moses*, is what seems to us to be an unsupported assumption in both cases that simply because section 236.1(c) requires the victim or the attempted victim to be a minor, an actual minor victim must necessarily be present under the Attempted Act Prong of the statute. This unsupported assumption ignores the reality that the electorate chose to punish both the attempt and the completed crime equally. The successful persuasion of a minor to commit a commercial sex act, and the attempt to persuade a minor to commit a commercial sex act, are equally blameworthy in the eyes of the statute. This choice by the electorate does not require a rewriting of the law of attempt. It simply requires that the elements of the Attempted Act Prong and the Completed Act Prong be recognized as differing, and that the defenses available under each prong may differ. Specifically, factual impossibility may be a defense under the Completed Act Prong (the victim turns out to be an adult), but not under the Attempted Act Prong (attempt is punished even in absence of an actual minor victim).

The opinion in *Shields*, and the majority opinion in *Moses*, rely upon what those courts believed was the "plain meaning" of section 236.1(c) (*Moses*, *supra*, 38 Cal.App.5th at pp. 761, 765-766, review granted) and the structure of CALCRIM No. 1244 (*Shields*, *supra*, 23 Cal.App.5th at pp. 1254-1256), to conclude that an actual minor must be the victim under both prongs of the statute. In doing so, both courts failed to give any consideration to the "plain meaning" of an "attempt to commit a crime," a phrase that has a "peculiar and appropriate meaning in law" (§ 7, subd. (16)), or the fact

that the statute punishes a violation of the Attempted Act Prong and the Completed Act Prong identically.  As to reliance on the "plain language" rationale, we note that section 288, subdivision (a) provides:  "[A] person who willfully and lewdly commits any lewd or lascivious act, . . . upon or with the body, or any part or member thereof, *of a child who is under the age of 14 years*, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."  The "plain language" of section 288, subdivision (a) requires a minor victim under the age of 14.  Yet an actual minor child is *not* required when defendant is charged with attempting to commit a lewd act on a child under the age of 14.  (*Reed*, *supra*, 53 Cal.App.4th at p. 396.)  The law recognizes that factual impossibility is not a defense to the attempt.  The *only* difference between *Reed*, and cases like it, and the instant case is that here the crime of attempt is made part of section 236.1(c), making the attempted act equally blameworthy to the completed act and making equal the punishment for both the attempted act and the completed act.  The difference does *not* lie in a "plain reading" of the statute.  It lies instead in the electorate's choice to punish both the attempted act and the completed act equally.

Finally, on the "plain reading" point, as Justice Aronson pointed out in his dissent in *Moses*, the recent case of *People v. Korwin*, *supra*, 36 Cal.App.5th 682, is persuasive.  In *Korwin*, the court construed section 288.3, subdivision (a) which provides: "Every person who contacts or communicates with a minor, or *attempts to contact or communicate with a minor*, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 287, 288, 288.2, 289, 311.1, 311.2, 311.4 or 311.11, or former Section 288a, involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."  (Italics added.)  The *Korwin* court held that the attempt prong of the statute did *not* require that an actual minor be the

16

victim. The attempt prong of the statute was violated by communications with a fictitious minor portrayed by a police officer. (*Korwin*, at p. 688.) Here again, the attempted act prong and the completed act prong are punished equally, and the *Korwin* court held the statute "incorporates attempt into the crime itself." (*Ibid*.)

Although infrequent, and as also noted by the dissenting opinion in *Moses*, other statutes have incorporated attempt as part of the substantive crime itself, and have punished both the attempt and the completed crime identically,[6] and courts considering these statutes have held that section 21a applies to the attempt prong. (*Moses*, *supra*, 38 Cal.App.5th at p. 771 (dis. opn. of Aronson, J.) [§ 136.1, subd. (a) ["prevents or dissuades" a witness from testifying, or "attempts to prevent or dissuade" a witness from testifying], review granted; §§ 4530, subd. (a), 4532, subd. (a)(1) ["escapes or attempts to escape"].) To those examples, we would add section 288.3 as noted above.

Another argument made in the majority opinion in *Moses*, is that section 236.1, subdivision (f) somehow precludes an interpretation that the Attempted Act Prong incorporates an attempt as defined in section 21a. Subdivision (f) provides: "Mistake of fact as to the age of a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section." Although somewhat murky, the *Moses* court appeared to reason that because mistake of fact is normally a defense to the crime of attempt, and because subdivision (f) precludes reliance on a mistake of age defense, the attempt referred to in section 236.1(c) is not a section 21a attempt. But as pointed out in the dissenting opinion in *Moses*, section 236.1(c) "is a statement of public policy barring the mistake of age defense in cases where there is an actual minor victim. The defense would still be available for human trafficking crimes not involving actual minors, unless precluded on other grounds."

---

[6]     Section 664, which generally prescribes punishments for the crime of attempt under section 21a, applies only "where no provision is made by law for the punishment of . . . attempts." (§ 664.)

17

(*Moses*, *supra*, 38 Cal.App.5th at pp. 773-774 (dis. opn. of Aronson, J.), review granted.) And, as also pointed out by Justice Aronson in his dissenting opinion, in *Reed, supra*, 53 Cal.App.4th 389, the court held that a mistake of fact about the existence of minor victims was not a defense to the crime of attempting to molest them because although the victims were fictional and created by undercover detectives (*Moses*, at p. 774 (dis. opn. of Aronson, J.), "if the circumstances had been as defendant believed them to be, he would have found in the room he entered two girls under fourteen available for him to engage in lewd and lascivious conduct with them." (*Reed*, at p. 397.) Thus, a defense often utilized in attempt cases may be precluded in certain types of cases as a matter of public policy. Although the mistake of age defense is unavailable, the prosecution still has the burden to prove that defendant specifically intended to take a direct act to cause, induce, or persuade a minor to commit a commercial sex act intending to effect or maintain a violation of one of the enumerated sex offenses, and actually took the direct act, even though the direct act was ineffectual.

*The Jury Was Properly Instructed*

Defendant argues that if we do not reverse his human trafficking of a minor conviction for insufficiency of the evidence we should nevertheless reverse for a new trial because the jury was improperly instructed. His argument is a rehash of his insufficiency argument and fails for the same reasons. Specifically, he argues that the court failed to instruct the jury that the statute requires an actual minor to exist. He also argues it was error for the court to instruct the jury that factual impossibility was not a defense to the Attempted Act Prong of section 236.1(c). These are the same arguments we rejected above.

At trial, the court considered CALCRIM No. 1244, which includes, under both the Attempted Act Prong and the Completed Act Prong of section 236.1(c), the requirement that the victim be under the age of 18. But recognizing that factual

18

impossibility is not a defense to an attempted crime, the court modified the instruction to read in relevant part as follows: "The defendant is charged in count one with attempting to cause, induce, or persuade a minor to engage in a commercial sex act. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant attempted to cause, induce, or persuade a minor to engage in a commercial sex act; [¶] And [¶] 2. When the defendant acted, he intended to commit a violation of pimping or pandering." "To prove that the defendant attempted to cause, induce, or persuade a minor to engage in a commercial sex act, the People must prove that: [¶] 1. The defendant took a direct but ineffective step toward causing, inducing, or persuading a minor to engage in a commercial sex act; [¶] And [¶] 2. When the defendant acted, the defendant intended to cause, induce, or persuade the minor to engage in a commercial sex act."

The court also instructed on factual impossibility as follows: "Factual impossibility is not a defense to attempt crimes. It is not a defense to count 1, human trafficking of a minor, and count 2, attempted pimping of a minor, that the alleged victim, 'Jessica,' was not actually a minor under 18 years of age at the time of the commission of the offenses."

At the time of trial, *Shields* had not yet been issued, and, of course, *Moses* was issued even later. The court was perhaps prescient in anticipating our opinion. It noted that the only difference between the instant case and a case involving attempted child molestation was that here the attempt was written into the statute. It instructed accordingly. As explained above, we conclude the court correctly instructed under the principles we have enunciated in this opinion.

*Defendant's Conviction for Attempted Pimping of a Minor*

Defendant contends the evidence is insufficient to sustain his conviction for attempted pimping because his conduct did not go beyond "mere preparation."

19

Defendant argues he encouraged Jessica to work for him but he did not "put[] a concrete criminal plan into action" because he did not pick up the choose up fee, take physical steps to meet her, or post online advertisements for her services. We disagree. Ample evidence supports the attempted pimping conviction.

"In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Pimping of a minor under section 266h, subdivision (b) includes three elements: (1) the defendant knew the person was a prostitute; (2) the defendant derived support in whole or in part from the money or proceeds the person earned as a prostitute; and (3) the person was under 18 years old. (*Ibid*.)[7] All that is needed to be convicted of attempted pimping of a minor is "a specific intent to commit the crime, and a direct but ineffectual act done toward its commission." (§ 21a.) "The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime." (*People v. Kipp* (1998) 18 Cal.4th 349, 376.) "'[A]cts which

---

[7]    There are two additional ways by which the second element of section 266h, subdivision (b) may be satisfied. (See CALCRIM No. 1150.) Because the jury was not instructed on those alternative, we do not address them.

20

indicate a certain, unambiguous intent to commit that specific crime, and, in themselves, are an immediate step in the present execution of the criminal design will be sufficient.'" (*People v. Jones* (1999) 75 Cal.App.4th 616, 627.)

Here, defendant does not dispute he had the specific intent to commit pimping of a minor. Substantial evidence also supports the jury's finding that defendant's acts went beyond mere preparation. Defendant repeatedly told Jessica to come to Los Angeles to work for him as a prostitute. He negotiated a choose up fee, gave Jessica specific instructions on how to send the money to him, and told her she could make $500 per night. He also told her he intended to have her on "the track" as well as online. He further arranged to meet her and told her how to take a bus to Los Angeles where he would pick her up. These acts show defendant did more than merely encourage Jessica to work for him. He arranged for her to work as a prostitute on his behalf and put the transaction into action. The only reason he never picked up the choose up fee is because he was arrested before he could do so.

Defendant relies on *Reed*, *supra*, 53 Cal.App.4th 389 and *People v. Herman* (2002) 97 Cal.App.4th 1369 (*Herman*), but neither of those cases involved an attempted pimping conviction. In *Reed*, the court affirmed the defendant's conviction for attempting to commit a lewd act on a child. (*Reed*, at pp. 399-401.) The defendant had several conversations with an undercover police officer who pretended to be the mother of two daughters. (*Id.* at pp. 393-394.) The defendant explained the sex acts he would perform on the children and arranged to meet them at a hotel. (*Id.* at pp. 393-395.) He was arrested when he arrived at the hotel with sex toys. (*Id.* at p. 395.) The court found "[h]is act of walking . . . into the room he expected to contain the girls was clearly a step beyond mere preparation for the crime . . . ." (*Id.* at p. 399.)

Likewise, in *Herman*, the court affirmed the defendant's conviction for attempting to commit a lewd act on a child. (*Herman*, *supra*, 97 Cal.App.4th at pp. 1372, 1392.) The defendant called a payphone where certain children congregated. (*Id.* at

21

p. 1374.)  He spoke to them on the phone and asked if they would perform sexual acts for money.  (*Ibid.*)  After they said they were not interested, the defendant drove to the location where the children were located, pulled out money and held it in front of them, and invited them into his car.  (*Ibid.*)  In holding the defendant's conduct went beyond mere preparation, the court reasoned:  "If defendant had merely telephoned victims and proposed lewd conduct at some indefinite time and place, it would have been possible to construe his conduct as that of an 'obscene phone caller' who derives all the gratification he seeks from the call itself and who therefore contemplates no physical encounter with the victim.  But when a caller follows up lewd telephonic propositions by acting deliberately to meet his victims in person, whereupon he offers incentives to participate in the suggested acts and proposes that they immediately accompany him to a place where such acts may presumably take place, a rational person could easily conclude beyond a reasonable doubt that 'a crime [was] about to be committed absent an intervening force.'"  (*Id.* at p. 1390.)

Defendant contends *Reed* and *Herman* found a defendant's plan "mature[s] from 'mere preparation' . . . to an 'unequivocal first act in carrying out the intended crime' . . . when the defendant arrive[s] at the location" where the crime would be committed.  He claims his conduct "is more appropriately analogized to the planning stages of Reed's initial correspondence with the undercover officer or Herman's initial phone call with the minors . . . ."  Contrary to defendant's suggestion, *Reed* and *Herman* do not limit the types of acts that constitute the initiation of a criminal offense.  "No clear marker divides acts that are merely preparatory from those initiating the criminal act. . . .  '[T]he more clearly the intent to commit the offense is shown . . . "the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement"' of an attempt."  (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1322.)

*People v. Garton* (2018) 4 Cal.5th 485, which defendant cites, also is distinguishable. In *Garton*, our Supreme Court found the defendant's actions did not satisfy the overt act element of attempted murder. (*Id.* at p. 515.) The defendant loaded his car with weapons and equipment and drove toward the state line with accomplices with the intent to murder someone in Oregon. (*Id.* at p. 511.) In finding the defendant's actions did not support an attempted murder conviction, the court focused on attempted murder case law and noted the importance of the defendant's "geographic proximity to the victim." (*Ibid.*) Because the defendant "had not arrived near the anticipated crime scene, sent his accomplices off to murder [the victim], or taken other action sufficient to accomplish the [victim's] murder from afar," the court held his actions did not satisfy the overt act element. (*Id.* at p. 513.) The same geographic proximity concerns and temporal gap do not exist here because defendant was arrested on the day he was planning to meet Jessica in Los Angeles.

We accordingly find substantial evidence supported the jury's finding that defendant's acts went beyond mere preparation.

*Sexual Offender Registration*

Defendant contends we should strike the requirement that he register as a sex offender and strike all the fines and fees associated with his convictions. Because we do not reverse the attempted pimping conviction and human trafficking of a minor conviction, there is no basis to reverse the registration order or fees.

*Admission of Evidence Regarding Defendant's Pimping and Pandering*

Defendant contends the court improperly admitted evidence that he pimped and pandered other women. The evidence included his text messages with third parties, screenshots of his Facebook and Instagram accounts, photographs and videos from his cell phone, and expert testimony about these items. He asserts all of this evidence was

23

improper character evidence under Evidence Code section 1101. He also claims the court should have excluded the evidence under Evidence Code section 352 because the evidence likely caused the jury to prejudge him, evoked an emotional bias against him, and tempted the jury to convict him based on his prior conduct. He further contends "the focus of the entire trial became about the fact that [defendant] was a pimp." Defendant accordingly argues we should remand the case for a new trial because his due process rights were violated. We disagree. The evidence was admissible to prove defendant's intent. Although the evidence was prejudicial, it also was highly probative, and we cannot conclude that no reasonable judge would have admitted the evidence.

Evidence Code section 1101, subdivision (a) provides: "Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Subdivision (b) provides several exceptions: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act." (*Id*., subd. (b).) We review the admission of evidence under Evidence Code section 1101 for an abuse of discretion. (*People v. Foster* (2010) 50 Cal.4th 1301, 1328.)

Here, the disputed evidence was relevant to the issue of defendant's intent. At trial, defendant's counsel argued defendant had no intention of pimping or pandering a minor. Instead, counsel argued defendant was entrapped because Jessica flattered him and "appeal[ed] to friendship [and] sympathy." Evidence of defendant's pimping activity was admissible to rebut these claims. As the court noted, a key "issue in this case is whether . . . defendant actually intended to have or to persuade the purported 17-year-old

24

to engage in commercial sex acts or whether he was just acting a part." The evidence gave "meaning to the conversations that [defendant had] with [Jessica]."

*People v. Scally* (2015) 243 Cal.App.4th 285 is on point. In *Scally*, we held the defendant's text messages with third parties were admissible under Evidence Code section 1101, subdivision (b), because the evidence was relevant to the defendant's intent. (*Scally*, at pp. 292-293.) The defendant was charged with pimping and pandering. (*Id.* at p. 291.) At trial, the defendant suggested he was innocent because the prostitute victim was his girlfriend. (*Id.* at p. 292.) In finding the defendant's text messages were admissible, we explained "the prosecution was entitled to . . . show[] that defendant is steeped in the pimping culture, thus undermining the claim that defendant was merely an innocent bystander." (*Id.* at pp. 292-293.)

Defendant contends *Scally* is distinguishable because it "did not address the issue . . . about the inherent similarity between permissive evidence of motive and intent, and impermissive character evidence." Relying on *People v. Gibson* (1976) 56 Cal.App.3d 119, defendant argues "[t]he present case requires an analysis on that point because any inference of motive or intent that could be drawn from the evidence that [defendant] had pimped and pandered other women was inextricably intertwined with an inference of bad character . . . ." While *Gibson* acknowledged "[o]ther-crimes evidence, admitted to prove a defendant's motive, is much closer to its use as character trait evidence than when it is offered solely to prove defendant's intent" (*Gibson*, at p. 129), the "absolute rule of exclusion [in Evidence Code section 1101, subdivision (a)] does not apply to prior conduct . . . which is relevant to prove more than mere criminal predisposition." (*People v. Alcala* (1984) 36 Cal.3d 604, 631, superseded by statute on a different point as stated in *People v. Hovarter* (2008) 44 Cal.4th 983, 1017, fn. 14.) As explained above, the evidence was relevant to prove more than defendant's criminal predisposition and provided context to the conversations defendant had with Jessica.

25

Defendant also suggests the People "blurred" the "fine distinction . . . between permissible and impermissible uses of the evidence" by asking the jury to find defendant guilty because he was a pimp. He further claims, "the trial became more about the fact that [defendant] was a pimp than it did about his conduct with Jessica." While the People referred to defendant's prior conduct and general pimping, we see no attempt to use the evidence to show bad character or propensity. Instead, the People argued the evidence showed defendant's intent was to pimp and pander.

Finally, defendant argues the court should have excluded the evidence under Evidence Code section 352. Evidence may be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*) "[T]he trial court [has] broad discretion when weighing the probative value and prejudicial effect of proffered evidence" (*People v. Gurule* (2002) 28 Cal.4th 557, 654), and that exercise of discretion "will not be disturbed on appeal unless the prejudicial effect of evidence so admitted clearly outweighed its probative value." (*People v. Anderson* (2001) 25 Cal.4th 543, 591.)

Here, the court correctly found it was a "close question" as to whether the disputed evidence should be excluded under Evidence Code section 352. On the one hand, the evidence was highly probative of defendant's intent in communicating with Jessica. Because defendant used language that is unique to the pimping subculture, the evidence provided the jury with context necessary to understand defendant's communications with Jessica. On the other hand, the evidence was prejudicial because there was a risk the jury could find defendant guilty based on his prior conduct. It also could evoke an emotional bias against defendant. Recognizing the prejudicial nature of the evidence, the court exercised its discretion by requiring redactions to defendant's text

26

messages and posts on Facebook and Instagram, excluding certain videos, and excluding photographs of defendant with large amounts of money.

Under the abuse of discretion standard, a "'"'decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.) Given our review of the disputed evidence, we cannot conclude that no reasonable judge would have admitted the evidence. We accordingly need not address the parties' arguments as to whether defendant was prejudiced by admission of the evidence.

*Medina's Expert Testimony*

Defendant contends Medina should not have been allowed to opine that defendant pimped and pandered Jessica and other women. He claims this testimony was improper because it was "tantamount to an opinion that [defendant] was guilty of the charged crimes." He also argues Medina's response to the People's hypothetical question was improper because he did not explain the reasons for his opinion. Finally, defendant contends the admission of Medina's improper testimony violated defendant's right to a jury trial and his due process rights. He accordingly requests that we remand the case for a new trial. Even assuming the court erred by admitting Medina's testimony, any error was harmless.

Applicable Law and Standard of Review

As a general rule, "'expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."'" (*People v. Vang* (2011) 52 Cal.4th

27

1038, 1044.)  The evidence may go to the ultimate issue in the case.  (Evid. Code, § 805 ["'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact'"].)  But "'[a] witness may not express an opinion on a defendant's guilt.  [Citations.]  The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue.  [Citations.]  "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact.  To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt."'"  (*Vang*, at p. 1048.)  Whether opinion testimony was properly admitted rests within the sound discretion of the trial court and "'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'"  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299.)

Disputed Testimony

In arguing Medina improperly opined defendant was a pimp and pandered Jessica and other women, defendant points to the following 10 examples of his testimony.

1.  "Q[:]  P Famous Da Great indicated to you he could possibly be involved in the pimping subculture?  [¶]  A[:]  Yes.  That alone, but when I went to his page, that began to form the opinion he could be a pimp."

2.  "Q[:]  When [defendant] said 'I'm waiting on you,' did that indicate anything to you?  [¶]  A[:]  Yes.  At that point, again, I was starting to form the opinion that he may be, in fact, trying to pander me."

3.  "Q[:]  You and [defendant] continued to have a conversation; Is that fair to say?  [¶]  A[:]  Yes, we did.  [¶]  Q[:]  And could you summarize what the gist of that entire conversation was?  [¶]  A[:]  The gist of the entire conversation in my opinion was [defendant's] efforts to pander me and secure me to work for him as a prostitute."

28

4. "Q[:] Can you remind the jury what 'flossing' is? [¶] A[:] Bragging who you are in that subculture. [¶] Q[:] The selfies you found on [defendant's] phone, were any consistent with flossing? [¶] A[:] Yes, I believe they were. [¶] Q[:] How so? [¶] A[:] They were consistent in that there were pictures of [defendant] with money fanned across his chest or hands indicative of showing the results of his pimping." The court sustained defendant's objection and stated, "Showing his results of pimping that part is stricken. The rest will remain."

5. "Q[:] And in reviewing those videos, do they have a general theme? [¶] A[:] Yes, they did. [¶] Q[:] What was that general theme? [¶] A[:] A lot of flossing, a lot of bragging from [defendant] about his pimping."

6. "Q[:] The audio we just heard, can you summarize and translate it for us? [¶] A[:] The audio to me it's just flossing. It's just an audio of [defendant] bragging about his pimping and the benefits and how well he's doing as a pimp. There's a lot of references to the terminology we talked about. The verbiage is consistent with the pimping and pandering subculture. Everything in the audio I would begin to form the opinion [defendant] was in fact a pimp." The court sustained defendant's objection and stated: "The last part providing an opinion, that part will be stricken, but the rest of the answer remains."

7. "Q[:] Did you find any text messages consistent with the defendant appearing to be pandering or encouraging other women to prostitute for him? [¶] A[:] Yes. [¶] Q[:] Approximately how many? [¶] A[:] The majority of the conversations that I read had to do with pandering another person."

8. "Q[:] Do you recall a conversation with the defendant and someone who appeared to be named Destiny? [¶] A[:] Yes. [¶] Q[:] Based upon your reading of those conversations, who did she appear to be in relation to the defendant? [¶] A[:] I think he was trying to pander her as well." The court overruled defendant's objection.

29

9. "Q[:] Moving on to a conversation [with someone else], do you recall seeing a conversation with someone that appears to be someone he met on Facebook who he is pandering? [¶] A[:] Yes. It sounds familiar, but I would have to see the text message." The court sustained defendant's objection and required the People to rephrase the question. "Q[:] Do you recall seeing text messages with different individuals where the defendant appeared to have met this person from Facebook and he was encouraging them to prostitute for him? [¶] A[:] Yes."

10. "Q[:] The entirety of the conversation with the girl in Oregon, what was that conversation in general about? [¶] A[:] Pandering the girl in Oregon, attempting to get her to work for him as a prostitute." The court sustained defendant's objection and struck the answer.

Based on a hypothetical constructed from the facts of the instant case, Medina also opined defendant "is absolutely attempting to traffic and encourage these people to be prostitutes on his behalf." Defendant argues Medina did not explain the reasons for this opinion.

Based on our review of the record, defendant did not object to all of the above testimony in the trial court proceedings, but even if he did and even assuming the court erred, any error was harmless. We cannot reverse the judgment unless it is reasonably probable there would have been a different outcome had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818.) Here, there was abundant evidence against defendant. Although Medina was the only witness who testified at trial, he testified about his interactions with defendant. During their conversations, defendant used language unique to the pimping and pandering subculture. He was aware Jessica was a minor and repeatedly told her to come to Los Angeles to work for him as a prostitute. He also negotiated a choose up fee, gave instructions on how she could send the money to him, and told her how to meet him in Los Angeles.

30

The court also instructed the jury with CALCRIM No. 332, which advised the jurors they did not have to accept Medina's expert opinion as true or correct. The court further instructed the jury with CALCRIM Nos. 200 and 226, which explained the jury's duty to decide the credibility of witnesses and issues based on its independent assessment of the evidence. Considering these instructions and the entire record, it is not reasonably probable defendant would have obtained a more favorable result absent the disputed testimony. (See *People v. Leonard* (2014) 228 Cal.App.4th 465, 493 [finding trial court's admission of expert's testimony that the defendant was a specific type of pimp was harmless error given the brief testimony and overwhelming evidence against the defendant].)

*Confrontation and Due Process Challenge*

Defendant next argues his Sixth Amendment confrontation rights and his Fourteenth Amendment due process rights were violated because he could not effectively cross-examine Medina. He claims he "did not have the ability to challenge the reliability of [Medina's] assertions," and Medina testified about information that was not provided in discovery. We disagree.

Medina's challenged testimony included the following.

1. Younger prostitutes refer to prostitution as "a game" while the more seasoned prostitutes refer to prostitution as "a life." The court overruled defendant's foundation objection and objection pursuant to *People v. Sanchez* (2016) 63 Cal.4th 665.

2. Over 90 percent of prostitutes who spoke to Medina indicated they were involved in prostitution before they turned 18 years old. The court overruled defendant's hearsay and confrontation clause objections.

3. Choose up fees commonly range from $1,500 to $2,500. The court overruled defendant's foundation objection.

31

4. It is common for female prostitutes to bring up the subject of a choose up fee before the pimp. The court overruled defendant's speculation objection.

5. Prostitutes typically make $500 to $5,000 per day. The court overruled defendant's hearsay and confrontation clause objections.

6. Impersonating Jessica, Medina communicated with other pimps who terminated the communications when they found out Jessica was a minor. The court overruled defendant's confrontation clause objection.

7. Medina found several online advertisements that included defendant's phone number and were consistent with prostitution. Defendant objected to this testimony and moved for a mistrial because the People only produced one advertisement during discovery. Defendant argued he could not confront Medina about the various advertisements he found. Medina later testified about one advertisement he found with defendant's phone number. Defendant renewed his motion for a mistrial, and the court denied the motion because Medina's testimony on the issue was "very brief" and it was clear he was referring to a single advertisement once questioning resumed.

8. Jessica had friends on Facebook who were human trafficking victims. On cross-examination, defendant asked Medina to provide the names of those victims. The court sustained the People's objection because it was concerned with disclosing the names of minor victims.

Here, the first six categories of disputed testimony concerned Medina's general knowledge in his field of expertise. The background information Medina relayed to the jury did not include testimonial hearsay or case-specific facts about defendant. (See *People v. Sanchez*, *supra*, 63 Cal.4th at p. 676 ["[A]n expert's testimony concerning his general knowledge, even if technically hearsay, has not been subject to exclusion on hearsay grounds"].) Defendant does not dispute this. Instead, defendant suggests he was "unable to effectively challenge the reliability of the information on which [Medina] relie[d]." He claims "[l]aw enforcement experts [like Medina] are different from

32

scientific or medical experts, whose expertise is based on reliable and provable scientific principles that are documented in publicly available text books, journal articles and other publications." According to defendant, "[a] law enforcement officer's expertise . . . is typically based on information learned during the course of investigations and conversations[, which] makes it nearly impossible for defense counsel to confront the reliability of any assertions the expert makes . . . ."

If we were to accept defendant's assertions, a law enforcement officer could never be an expert witness. We do not adopt such a broad and impractical rule. Contrary to defendant's argument, he could have challenged the reliability of the information on which Medina relied. On cross-examination, defendant could have probed the basis for Medina's opinions.

We also disagree with defendant's contention the court erred by denying his motion for mistrial. Defendant's motion was based on Medina's initial testimony that he searched for defendant's phone number online and found "links to other advertisements that [he] believe[d] were consistent with prostitution." While the parties do not dispute the People produced only one advertisement during discovery, defendant concedes "[b]oth counsel agreed the best way to approach the issue was for the prosecutor to focus her questioning on the ad[vertisement] that was provided in discovery." Medina then testified about one advertisement he found related to defendant's phone number. Based on this record, there was no error.

Defendant also contends the court erred by prohibiting him from asking Medina about Jessica's Facebook friends. Given the personal privacy concerns at issue, the court did not abuse its discretion by preventing disclosure of the names of minors who were human trafficking victims. (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1251 ["'[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial,

33

confusing of the issues, or of marginal relevance'"].)  Although defendant claims he could not cross-examine "Medina on a topic that would have provided a specific example of Medina embellishing his testimony," defendant did have the opportunity to question Medina's credibility.  On cross-examination, he could have sought to undermine Medina's testimony by asking how many of Jessica's friends were victims of human trafficking or questioning how Medina knew they were victims.  Regardless, there was no prejudicial error because defendant concedes Medina "walked back his assertion that Jessica was friends with victims (plural) and testified that he could think of 'one' person who was a friend of Jessica's on Facebook who was a minor and a prior victim . . . ."

Defendant relies on *Davis v. Alaska* (1974) 415 U.S. 308 to support his claim of constitutional error, but it is distinguishable.  In *Davis*, the trial court barred the defendant from cross-examining a minor about his confidential juvenile offender record to show possible bias.  (*Id.* at pp. 313-314.)  The United States Supreme Court found the defendant's confrontation rights were violated because he was not allowed to impeach the minor's credibility.  (*Id.* at pp. 313-321.)  The case did not involve the same privacy concerns as here.  And, as explained above, defendant did have the opportunity to question Medina's credibility.

Finally, defendant relies on *Pennsylvania v. Ritchie* (1987) 480 U.S. 39 to argue his due process rights were violated because he "was not provided with sufficient discovery from which he could effectively cross examine Medina on the assertions he was making."  In *Ritchie*, the defendant was charged with committing sexual acts on his daughter.  (*Id.* at p. 43.)  Before trial, the defendant served the state's child protection services agency with a subpoena requesting the record of its investigation.  (*Ibid.*)  The trial court rejected the request.  (*Id.* at p. 44.)  The United States Supreme Court remanded the case for the trial court to conduct a review of the documents.  (*Id.* at p. 58.)  While there were specific documents that could have been produced in camera in *Ritchie*, defendant acknowledges there were no documents the People could produce in the instant

34

case.  To state the obvious, an expert does not have to produce documents supporting his testimony when there are none.

*No Cumulative Error*

Defendant contends the cumulative effect of the individual errors compels reversal.  Because we reject defendant's contentions of error on appeal, there was no cumulative error.

DISPOSITION

The judgment is affirmed.

IKOLA, J.

I CONCUR:

MOORE, J.

O'LEARY, P.J., Dissenting.

The majority holds the existence of an actual minor or real person is not required to sustain a conviction for human trafficking of a minor under Penal Code section 236.1, subdivision (c) (section 236.1(c)), where defendant is charged with an attempt under the statute. From this holding, I respectfully dissent. In all other respects, I concur in the majority opinion.

Like the majority, I place substantial reliance on the words of the statute in reaching my conclusion that evidence of an actual minor is necessary to sustain a conviction under section 236.1(c). The wording of the statute bears repeating: "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of [s]ection 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking." I agree with the majority, the statute has two distinct prongs, (1) the Completed Act Prong, and (2) the Attempted Act Prong. The statute is violated when the elements of either prong are established. An essential element of each prong is a victim who is a minor. There is no dispute that no such victim exists in this case. The *victim* was an Anaheim police officer who worked as an investigator for the Orange County Human Trafficking Task Force.

The majority holds a defendant may be convicted under the Attempted Act Prong when the "victim" is not a minor. The majority reasons factual impossibility is foreclosed when the proscribed unlawful act is charged as an attempt. (Maj. opn. *ante*, at p. 12.) I agree a defendant may be convicted of an attempt to commit an offense when the defendant has the specific intent to commit the offense but is unaware one of the essential elements of the offense is lacking. A common factual scenario demonstrating this theory is found in receiving stolen property cases. Where the defendant has the

1

specific intent to receive property believing it to be stolen, even though it is not, the defendant is guilty of attempted receiving stolen property. (*People v. Wright* (1980) 105 Cal.App.3d. 339.) But Clark was not charged with or convicted of *attempted* human trafficking (§§ 664/236.1), he was convicted of a straight violation of section 236.1(c). The *Shields* court noted the language of section 236.1(c) requires the victim to be a "person who is a minor at the time of the commission of the offense." (*People v. Shields* (2018) 23 Cal.App.5th 1242, 1255-1257.) Relying on the plain language of the statute, it held this requirement constitutes an essential element of a subdivision (c) violation. Without this necessary element, the statute cannot be violated. (*Shields, supra,* 23 Cal.App.5th at pp. 1255-1256.) I agree.

Section 236.1(c) seeks to punish the offender who is unsuccessful in an attempt to cause, induce, or persuade a minor to engage in a commercial sex act. This second prong applies to circumstances such as when defendant's efforts are thwarted because successful contact is never made with the minor. It would also apply to circumstances demonstrating a defendant attempted to cause, induce, or persuade a minor to engage in an act of commercial sex, but the defendant's acts were ineffectual and the minor never engaged in a commercial sex act. Based on the words of the statute, such attempts would be sufficient to violate the Attempted Act Prong of the statute. The statute equally punishes completed and attempted crimes involving minors.

The majority asserts the conclusion an actual minor victim must necessarily be present under the Attempted Act Prong is "an unsupported assumption," which "ignores the reality that the electorate chose to punish the attempted and the completed crimes equally." (Maj. opn. *ante*, at p. 15.) Not so. This interpretation is supported by simply reading the plain unambiguous language of the statute, which clearly defines the victim under both prongs as being "a person who is a minor at the time" of the offense. (§ 236.1(c).) Had the drafters of the initiative sought to include as potential victims,

2

persons other than minors, different wording would have been used. For example, the statute could have prohibited the same acts when directed towards a minor, *or a person who the defendant subjectively believes is a minor.* Without a minor, it is factually impossible to violate the Attempted Act Prong of the statute, because the victim's age is a necessary element of both prongs of the statute.

This factual impossibility does not mean defendant did not commit a crime. I agree with the *Shields* court's holding that when criminal defendant's intended victim is an imaginary person or a law enforcement officer posing as a minor, the crime is an attempt of section 236.1(c). (*Shields, supra*, 23 Cal.App.5th at p. 1256.) I cannot join with the majority's decision to rewrite the statute to include factual impossibility as a defense under the Completed Act Prong but not the Attempted Act Prong (Maj. opn. *ante*, at p. 15.), so that it comports with the majority's view of what the voters intended. Courts may not under the guise of statutory construction, rewrite unambiguous language and ignore the plain meaning rule. (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist*. (1997) 14 Cal.4th 627, 633 [court lacks power to rewrite statute to make it ""conform to a presumed intention which is not expressed""].)

Here, it is not the defendant's unsuccessful efforts to cause, induce, or persuade a minor to engage in a commercial sex act that prevents the act from being completed, it is the nonexistence of a minor, a necessary element of each prong. Accordingly, I would reverse the conviction on count 1.


O'LEARY, P. J.


3